IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAURLANNA BRAXTON, *et al.* | \| |
| | \| |
| Plaintiffs, | \| |
| vs. | \| |
| | \| Case No. 1:15-cv-03661-EHL |
| ELDORADO LOUNGE INC.*, et al* | \| |
| | \| |
| Defendants. | \| |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,


/s/ _____
Ken C. Gauvey (28464)
Law Practice of Ken C. Gauvey
6700 Alexander Bell Drive
Suite 200
Columbia, MD 21046
(P) 410-346-2377
(F) 866-487-1154
kgauvey@gauveylaw.com
*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**A.  INTRODUCTION**                                                           pg. 2

**B.  STATEMENT OF UNDIPSUTED FACTS**                                          pg. 2

    *1.  The three defendants are a single joint enterprise*         pg. 2

    *2.  Plaintiffs were employees of Defendants*                    pg. 3

    *3.  Plaintiffs were not paid hourly wages*                      pg. 5

    *4.  Plaintiffs were exotic dancers working at
        gentlemens' clubs*                                        pg. 6

**C.  DISCUSSION**                                                             pg. 7

    **1.  Summary Judgment Standards**                              pg. 7

    **2.  The remedial purpose of wage and hour laws requires
        the Court to interpret those laws broadly in favor of
        the employee, and stringently against the employer.**     pg. 8

    **3.  The FLSA is applicable to both corporate
        entities as joint employers in this matter.**             pg. 10

    **4.  The FLSA and Maryland wage laws are applicable
        to Defendant Jackson.**                                   pg. 12

    **5.  The economic realities and the totality of the
        circumstances evince that Plaintiffs were Defendants'
        employees under Federal and Maryland law.**               pg. 13

        *a.  Defendants had ultimate control over Plaintiffs work*   pg. 18

        *b.  The managerial skills of Defendants and not
            of Plaintiffs controlled Plaintiffs' opportunity for
            profit or loss.*                                     pg. 20

        *c.  Defendants' investment was substantial while
            Plaintiffs' investment was nominal.*                 pg. 20

        *d.  There was no degree of skill required for Plaintiffs
            to perform their job duties.*                        pg. 21

     *e.   The permanence of the working relationship
between Plaintiffs and Defendants is wholly
consistent with "at will" employment.*        **pg. 21**

     *f.   Plaintiffs' services were utterly integral to
Defendants' business.*        **pg. 22**

     *g.   Plaintiffs were employees of Defendants rather
than independent contractors.*        **pg. 23**

**6.   Defendants are liable to Plaintiffs jointly and severally
for wages.**        **pg. 24**

     *a.   Defendants are liable under the FLSA and
the MWHL.*        **pg. 24**

     *b.   Defendants are liable under the MWPCL.*        **pg. 26**

**7.   Defendants' affirmative defenses are inapplicable.**        **pg. 26**

     *a.   It is Defendants' burden to prove their
affirmative defenses.*        **pg. 26**

     *b.   Defendants' affirmative defense of setoff cannot
be established as a matter of law.*        **pg. 26**

     *c.   Defendants cannot utilize the tipped-employee
exemption to the minimum wage as a defense
to the wages owed Plaintiffs.*        **pg. 29**

     *d.   Each of Defendants' remaining affirmative defenses
are inapplicable.*        **pg. 29**

**D.  <u>CONCLUSION</u>**        **pg. 30**

## EXHIBIT LIST

Exhibit 1:                                    Deposition Transcript for the deposition of
                                              Defendant Kenneth Jackson

Exhibit 2:                                    Declaration of Plaintiff Brittany Scott

Exhibit 3:                                    Employment Application

Exhibit 4:                                    Rules and Regulations

Exhibit 5:                                    Declaration of Plaintiff Maurlanna Braxton

Exhibit 6:                                    Defendants' Answers to Interrogatories

Exhibit 7:                                    Defendants' Responses to Requests for the
                                              Production of Documents

Exhibit 8:                                    Defendants' "Commission Reports"

Exhibit 9:                                    Adult Entertainment Rules and Regulations

Exhibit 10:                                   Defendants' Response to Second Amended
                                              Complaint and Request for Dismissal

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

MAURLANNA BRAXTON,  *et al.*

        Plaintiffs,

vs.

ELDORADO LOUNGE INC*., et al*

        Defendants.

---

Case No. 1:15-cv-03661-EHL

**PLAINTFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff herein moves for summary judgment against all defendants.  The undisputed facts demonstrate that Defendants employed Plaintiffs, but misclassified them as independent contractors.  The undisputed facts also demonstrate that Defendants did not pay Plaintiff any wages for hours worked and, instead, made Plaintiffs pay Defendants for working at Defendants' establishments. Finally, the undisputed facts demonstrate that the affirmative defenses raised by Defendants do not apply.  While the ultimate damage amounts owed to each Plaintiff remains a question of fact at this stage, Plaintiffs move for Partial Summary Judgment on the following issues:

    A.  At all times relevant to this action, Plaintiffs were employees of Defendants pursuant to the FLSA, MWHL, and MWPCL.

    B.  Defendants violated the FLSA, MWHL and MWPCL by failing to pay Plaintiffs at an hourly rate at least equal to the required state and federal minimum wage.

    C.  Plaintiffs are entitled to recover unpaid wage damages equal to the free and clear Federal Minimum Wage for all hours worked each week while in Defendants' employ;

D.  That Defendants' affirmative defenses including all arguments for the service fee offset may not be applied to mitigate or negate any to-be-determined wages and damaged owed by Defendants to Plaintiffs.

## A.    INTRODUCTION

Defendants consist of two gentlemen's clubs and their owner.  Defendants employed dancers at the clubs and directed their work by providing rules for the workplace, mandating that the dancers be on the floor at all times unless on stage or providing premium services, and prohibiting dancers from leaving the buildings until their shift ended, among other rules.  Plaintiffs were not paid any wages for the work they performed.  Indeed, the dancers were required to pay Defendants a fee for working for Defendants.  Plaintiffs have brought this action to recover the wages owed them by Defendants jointly and severally.

## B.    STATEMENT OF UNDISPUTED FACTS

### 1.    The three defendants are a single joint enterprise.

Defendant Kenneth Jackson owes and operates Defendants El Dorado, Inc. and 414 LLC.  Mr. Jackson is the President of El Dorado, Inc. Jackson 10-11.[1]  The other officers are made up of Mr. Jackson's family, but their roll is "just to fill the seat" of the other corporate officers.  Jackson 11. Mr. Jackson is also one of the two members of 414 LLC.  Jackson 12-13.  Mr. Jackson owns 50% of 414 LLC. Jackson 12.

El Dorado, Inc. and 414 LLC have sufficient ties to be considered a joint enterprise.  Both entities use the same accountant. Jackson 17.  Both entities use the same bookkeeper.  Jackson 19.  Mr. Jackson writes the checks for El Dorado as well as 414 LLC.  Jackson 21.  William Sheppard, the other member of 414 LLC handles the club

---

[1] The transcript of Defendant Kenneth Jackson's deposition is attached hereto as Exhibit 1, and referred to herein as "Jackson" followed by the page number cited.

rental for both El Dorado Inc. and 414 LLC.  Jackson 23.  The same employment

application is used at both El Dorado, Inc. and 414 LLC.  Jackson 49-50.  Both entities

utilized the same tracking, POS system.  Jackson 81-83.  Some Plaintiffs, Ms. Braxton

and Ms. Gamble, were assigned to work both at El Dorado, Inc. and 414 LLC.  Jackson

66.  Ms. Scott was trained as a bartender at El Dorado with the intention that she work in

that capacity at 414, LLC.  Scott Declaration attached hereto as Exhibit 2.  It was at 414

LLC that Mr. Jackson met with Ms. Braxton and Ms. Gamble.  Jackson 66, 77-78.

Plaintiffs were sent from El Dorado to 414 LLC when needed.  When asked if

dancers were sent from El Dorado to 414 LLC, Defendant Jackson answered only, "Not

by me."  Jackson 37.  When asked if it was possible that any of the other management

would have asked them to go to 414 LLC, Defendant Jackson answered "I don't know."

Jackson 37.  However, Plaintiff Scott testifies that she was often told by William

Sheppard, who managed and/or owned part of 414 LLC, to go work at 414, LLC when

that club was short dancers.  Exhibit 2.

The total income of Defendants exceeds $500,000.00.  Mr. Jackson testified that

El Dorado typically did about $400,000 in gross sales.  Jackson 13-14.  Mr. Jackson also

testified that 414, LLC typically did approximately $300,000 in gross sales.  Jackson 15.

As such, according to Defendant Jackson, the owner of both El Dorado and 414, LLC,

the total gross receipts of the clubs exceeded $700,000.

### 2.     *Plaintiffs were employees of Defendants.*

Defendants hired dancers as employees.  To work for Defendants, an exotic

dancer had to fill out an application.  Jackson 48.  The application itself states

"Employment Application."  *See* Employment Application attached hereto as Exhibit 3.

When a dancer is hired, Defendants provide a list of rules for the dancers to abide by. Jackson 64-65. Defendants provided Rules and Regulations to Plaintiffs when the dancers were hired. *See* Rules and Regulations attached hereto as Exhibit 4, Jackson 64. Defendants provide no training to the exotic dancers. Jackson 60. Nor are any skills required. Jackson 60. Plaintiffs were required to sign in and out for their shift. Jackson 82. Defendants could, and did, send Dancers home, and suspend them. Jackson 122.

Mr. Jackson is the final decision maker with regards to everything that happens at El Dorado Inc. Jackson 38. Mr. Jackson set the hours of the club. Jackson 129. Mr. Jackson determined the promotional activities. Jackson 112-113. Mr. Jackson testified:

> Q.     Who do you consult when you come with this promotions?
> A.     Is there somebody I should consult?
> Q.     I don't know, who do you talk to to come up with the ideas?
> A.     Nobody. I might talk to a promoter if he wants to do something.

*Id.* Mr. Jackson established the décor of the club, and decided what types of drinks to sell. Exhibit 2, *see also* Declaration of Plaintiff Maurlanna Braxton attached hereto as Exhibit 5. Mr. Jackson set the drink prices, and lap dance prices. Exhibits 2, 5. In addition, Defendants chose what music to play, albeit with occasional input from the dancers if the dancers provided the proper tip. Exhibits 2, 5. Indeed, Plaintiffs state that if they wanted the DJ to play particular songs for Plaintiffs when Plaintiffs danced, they had to pay for that. *Id.* Mr. Jackson also monitored "each and everything" Plaintiffs sold. Jackson 57.

Dancers had to pay Defendants to work in the form of a "tip in." That "tip in" was taken from the dancers to pay Defendants' employees such as security, house moms and DJs, and represented deductions to cover potential repairs of the equipment on the proper if a dancer broke something. Jackson 90, 98-99. The "tip in" amount varied

according to Mr. Jackson.  Jackson 90-91.  Defendants did not provide any documents to
indicate what Plaintiffs paid as a "tip in" amount, despite being requested that Defendants
do so.  Jackson 95-96.  However, Mr. Jackson later stated that the tip-in amount was $35
on most nights. Jackson 97.

### 3. *Plaintiffs were not paid hourly wages.*

Defendants did not pay Plaintiffs wages for each out worked.  *See* Answers to
Interrogatories attached hereto as Exhibit 6 at Answer to Interrogatory No. 4, pgs. 8-9.
Rather than pay wages, Defendants subjected Plaintiffs to various pay structures.
Plaintiffs would get a commission for drink sales.   Jackson 56.  According to Mr.
Jackson, Defendants received no monies for lap dances.  Jackson 62, 100, 114.

Defendants did not produce any documents to demonstrate how those
commissions worked with regards to gross receipts. In Plaintiffs' discovery requests,
Plaintiffs requested, "[a]ll *documents* that contain, reflect, describe and/or otherwise set
forth and/or support any defense any Defendant asserts or will assert in this action."
Exhibit 7 at pg. 10, Request No. 5.  Defendants responded with 29 objections and did not
provide any documents in response.  *Id.*  In Plaintiffs' Request No. 6, Plaintiffs requested
"[a]ll documents that contain, reflect, describe and/or otherwise describe any mitigation,
set-off, offset, or counter-claim calculation or damages that any Defendant has or may
assert in this case." *Id*. at Request No. 6 at pg. 10.  Defendants responded with 29
objections and provided only documents purporting to show that in some weeks Plaintiffs
were paid commissions.  *Id.* No documentation regarding any mitigation, set-off, or offset
was provided.  Defendants' entire document production consists of commission sheets,
contracts and W9 executed by Plaintiff Williams, some promotional materials, 1099s

5

issued to Ms. Braxton and Ms. Williams, and state regulations regarding exotic clubs.

Exhibit 8.  No documents regarding gross receipts or how any monies were applied to

Defendants income have been provided by Defendants.

### 4.    *Plaintiffs were exotic dancers working at gentlemens' clubs.*

El Dorado, Inc. and 414 LLC have exotic dancers working every night the clubs

are not rented out.  Jackson 26 – 27.  Mr. Jackson testified that despite having exotic

dancers every night, the true purpose of Defendants was to sell drinks.  Jackson 56.

Despite this, Mr. Jackson kept and provided to the dancers the state regulations regarding

exotic dance clubs.  *See* Adult Entertainment Rules and Regulations attached hereto as

Exhibit 0.  Moreover, Plaintiffs worked for years for Defendants. Indeed, Defendants

claim that Ms. Braxton worked approximately 144 weeks for Defendants.  *See*

Defendants' Response to Second Amended Complaint and Request for Dismissal

attached hereto as Exhibit 10 at pg. 7.  Defendants contend that Ms. Scott worked 96

weeks for Defendants.  *Id.*  Defendants contend that Ms. Gamble worked 156 weeks for

Defendants. *Id.*  Defendants contend that Ms. Williams worked 84 weeks for Defendants.

*Id.*  This was not *ad hoc* employment, but rather employment for a significant period of

time.

The undisputed facts are clear. The corporate Defendants are exotic clubs, ie.

Gentlemen's Clubs.  Defendant Jackson controlled those clubs and Plaintiffs' work.

Defendants did not pay wages.  Rather, Defendants paid what Defendants called

"commissions."  However, Defendants did not provide any records as to how those

commissions were calculated.  Nor did Defendants provide any documents that

demonstrate whether those commissions were received as gross receipts.  Moreover, the

limited records Defendants did provide demonstrate that the "commissions" paid did not amount to minimum wage, especially when considering the tip-in requirements. As such, the Defendants can only be considered the employers of Plaintiffs, and Defendants affirmative defenses are inapplicable. As such, Summary Judgment is proper as a matter of law, and the only remaining issues before the Court should be the actual number of hours worked by Plaintiffs for Defendants and the wages owed as a result of those hours worked.

## C.   DISCUSSION

### 1.   Summary Judgment Standards

Summary judgment is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material facts to resolve. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir. 1987).  In determining whether summary judgment should be granted, the court "must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party." *Id.* (citing *Gill v. Rollins Protective Services Co.,* 773 F.2d 592, 598 (4th Cir. 1985)). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial.  *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 535-536 (D. Md. 2007).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Id.*  Instead, the evidentiary materials submitted

must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Anderson,* 477 U.S. at 251.

Moreover, to be entitled to consideration on summary judgment, the evidence supporting the facts set forth by the parties must be such as would be admissible in evidence. *See* FED. R. CIV. P. 56(c); *see also Sakaria v. Trans World Airlines,* 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment); *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial.").  With regard to documentary evidence, this Court previously has held that,

> [u]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment. To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)-that the documents be admissible in evidence.

*Miskin v. Baxter Healthcare Corp. et al.,* 107 F. Supp. 2d 669 (D. Md. 1999) (citing *Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir. 1993).

**2.      The remedial purpose of wage and hour laws requires the Court to interpret those laws broadly in favor of the employee, and stringently against the employer.**

The remedial purpose of the Fair Labor Standards Act, as well as the Maryland Wage Payment and Collection Act and Maryland Wage and Hour Law, place a significant burden on employers to justify their pay policies.  The FLSA was enacted to combat "labor conditions detrimental to the maintenance of the minimum standard of living

necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). "The central aim of the Act was to achieve . . . certain minimum labor standards." *Mitchell v. Robert DeMario Jewelry, Inc*., 361 U.S. 288, 292, 80 S. Ct. 332, 4 L. Ed. 2d 323 (1960).  Indeed, the 4th Circuit has held that "the remedial nature of the statute requires that FLSA exemptions be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit.'"  *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337-338 (4th Cir. Va. 2008).  This applies to Maryland wage laws as well where the Courts have stated that the Maryland courts interpret Maryland wage and hours laws broadly to "effectuate the FLSA's broad remedial purposes."  *Coles v. Von Paris Enters*., 2014 U.S. Dist. LEXIS 167864, *9 (D. Md. Dec. 3, 2014) quoting *Newell v. Runnels*, 407 Md. 578, 967 A.2d 729, 771 (2009).  It is axiomatic that it is the employer's burden to prove that an employee is compensated in accordance with the laws and regulations regarding wage and hour laws. *Darveau*, at 337 ("An employer bears the burden of proving that a particular employee's job falls within such an exemption.").  Additionally, "the remedial nature of the statute requires that FLSA exemptions be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit.'" *Id.* (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)).  The Supreme Court has consistently held that the FLSA "must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698, 88 L. Ed. 949 (1944). This burden is strict because "[t]he FLSA was enacted to "protect the rights of those who toil, of those who sacrifice a full

measure of their freedom and talents to the use and profit of others." *Benshoff v. City of Virginia Beach,* 180 F.3d 136, 140 (4th Cir. 1999). Since the FLSA is "remedial and humanitarian in purpose," it should be interpreted broadly so as to effectuate its goals. *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 768 (D. Md. 2008).

**3.    The FLSA is applicable to both corporate entities as joint employers in this matter.**

On January 25, 2017, the United States Court of Appeals for the Fourth Circuit articulated a test to determine whether two or more entities are the joint employers of Plaintiffs. *Salinas v. Commercial Interiors, Inc.*, Case No. 15-1915, 2017 U.S. App. LEXIS 1321, *9, 2017 WL 360542 (4th Cir. Md. Jan. 25, 2017). In *Salinas*, the Court stated that the essential, fundamental question in making this determination is whether

> two or more persons or entities are not completely dissociated with respect to a worker such that the persons or entities share, agree to allocate responsibility for, or otherwise codetermine – formally or informally, directly or indirectly – the essential terms and conditions of the worker's employment.

*Id.* In answer this question courts should consider the following:

(1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3) The degree of permanency and duration of the relationship between the putative joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at *30-31.  The Court went on to state that these six factors

do not constitute an exhaustive list of all potentially relevant considerations.  To the extent that facts not captured by these factors speak to the fundamental threshold question that must be resolved in every joint employment case – whether a purported joint employer shares or codetermines the essential terms and conditions of a workers' employment – courts must consider those facts as well.

*Id.* at *31.  This test still requires the Court to make the determination on joint employment based upon the circumstances of the whole activity.  *Id.*

The undisputed facts demonstrate Defendants Eldorado and 414 LLC operate as a single business entity.  Both clubs employ exotic dancers and serve alcohol.  Ownership in both clubs is vested in Defendant Jackson.  Both entities use the same accountant. Jackson 17.  Both entities use the same bookkeeper.  Jackson 19.  Mr. Jackson writes the checks for El Dorado as well as 414 LLC.  Jackson 21.  William Sheppard, the other member of 414 LLC handles the club rental for both El Dorado Inc. and 414 LLC. Jackson 23. The same employment application is used at both El Dorado, Inc. and 414 LLC.  Jackson 49-50.  Both entities utilized the same tracking, POS system. Jackson 81-83.  Some Plaintiffs, Ms. Braxton and Ms. Gamble, were assigned to work both at El Dorado, Inc. and 414 LLC. Jackson 66.  Ms. Scott was trained as a bartender at El Dorado with the intention that she work in that capacity at 414, LLC.  Exhibit 2.  It was at 414 LLC that Mr. Jackson met with Ms. Braxton and Ms. Gamble.  Jackson 66, 77-78.

The undisputed facts demonstrate unified operation, related activity, interdependency, and a centralization of ownership or control, all of which indicate the existence of Defendants Eldorado and 414, LLC as joint employers.  As such, Eldorado and 414 constitute a single enterprise under the FLSA.

The FLSA applies to an "enterprise engaged in commerce."  Section 29 U.S.C. § 203(s)(1)(A)(ii) provides, in part that an "enterprise engaged in commerce" is "an enterprise whose annual gross volume of sales made or business done is not less than $500,000.00.  Mr. Jackson testified that El Dorado typically did about $400,000 in gross sales.  Jackson 14.  Mr. Jackson also testified that 414, LLC typically did approximately $300,000 in gross sales.  Jackson 15.  As such, according to Defendant Jackson, the owner of both El Dorado and 414, LLC, the total gross receipts of the clubs exceeded $700,000.[2]  As such, the FLSA applies as Defendants are an "enterprise engaged in commerce."

**4.     The FLSA and Maryland wage laws are applicable to Defendant Jackson.**

It is axiomatic that the FLSA and Maryland law provides for individual liability in the proper circumstances.  In reviewing whether personal liability should attach, the Courts consider whether the employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Avila v. Caring Hearts & Hands Assisted Living & Elder Care*, LLC, 2016 U.S. Dist.

---

[2] As of the date of this filing, Defendants have refused to provide tax records in a usable form that may be introduced as evidence in this matter, despite the existence of this Court's Order dated December 21, 2016.  As such, the only admissible evidence in existence in this matter is Mr. Jackson's own testimony which clearly indicates that the joint employer Defendants received gross receipts in excess of $500,000.00.

LEXIS 100904, *7-8 (D. Md. Aug. 1, 2016) *citing Kerr v. Marshall Univ. Bd. Of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Newell v. Runnels*, 407 Md. 578, 650, 967 A.2d 729 at 772; *Campusano v. Lusitano Constr. LLC*, 208 Md. App. 29, 38-39, 56 A.3d at 309 (Md App. 2012).

It is undisputed that Defendant Jackson was Plaintiffs' "employer" under the FLSA.  Defendant Jackson had the power to suspend and fire dancers.  Jackson 129, 130, 139.  Defendant Jackson supervised and controlled Plaintiffs' work schedules and conditions of employment.  Jackson 38, 57-59, 139.  Defendant Jackson set the method of pay for Plaintiffs.  Jackson 38.  Finally, Defendant Jackson maintained employment records as demonstrated by the commission sheets provided by Defendants in discovery and Mr. Jackson's own testimony.  Jackson 53, 61; Exhibit 8.  It cannot possibly be disputed that Defendant Jackson was Plaintiffs' employer pursuant to the FLSA as well as Maryland law.  As such, personal liability applies to Mr. Jackson in Plaintiffs' claims.

**5.**     **The economic realities and the totality of the circumstances evince that Plaintiffs were Defendants' employees under Federal and Maryland law.**

The term "employer" under the FLSA is generally "interpreted broadly to achieve Congress's intent to provide a remedy to employees for their employers' wage and hour violations." *Mendoza v. Mo's Fisherman Exch., Inc*., 2016 U.S. Dist. LEXIS 81764, *47-48 (D. Md. June 22, 2016) *quoting Pearson v. Prof'l 50 States Prot., LLC*, No. RDB-09-3232, 2010 U.S. Dist. LEXIS 113859, 2010 WL 4225533, at *3 (D. Md. Oct. 26, 2010); *see also Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (articulating that the FLSA should be interpreted broadly). The scope of the FLSA, however, is not limitless. *See Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999).  The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C.

203(e)(1), and "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. 203(d). Similarly, the definition of "employer" in the Maryland Wage and Hour Law is "any person who employs an individual in the State or a successor of the person." Md Code, Lab &Empl. § 3-501(b).

The "suffer or permit" standard was specifically designed to ensure as broad of a scope of statutory coverage as possible. See *United States v. Rosenwasser*, 323 U.S. 360, 362-63 ("A broader or more comprehensive coverage of employees . . . would be difficult to frame."); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("employ" is defined with "striking breadth"). The United States Supreme Court "has consistently construed the Act 'liberally to apply to the furthest reaches consistent with congressional direction,' recognizing that broad coverage is essential to accomplish the [Act's] goal…" *Tony & Susan Alamo Found* v. *Sec'y of Labor*, 471 U.S. 290, 296 (1985) (*quoting Mitchell v. Lublin, McGaughy & Assocs*. 358 U.S. 207, 211 (1959)) (internal citation omitted).

Unlike the common law control test, which analyzes whether a worker is an employee based on the employer's control over the worker and not the broader economic realities of the working relationship, the "suffer or permit" standard broadens the scope of employment relationships covered by the FLSA. As the Supreme Court explained:

> [I]n determining who are "employees" under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.

*Walling v. Portland Terminal Co.*, 330 U.S 148, 150-51 (internal citation omitted); see also Darden, 503 U.S. at 326 (FLSA's "suffer or permit" standard for employment "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."); *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11ₜₕCir. 1996) ("Indeed, the 'suffer or permit to work' standard was developed to assign responsibility to businesses that did not directly supervise putative employees."). Thus, the scope of employment under the FLSA is the "'broadest definition that has ever been included in any one act.'" *Rosenwasser*, 323 U.S. at 363 n.3 (quoting from statement of Senator Black on Senate floor).

An "entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Antenor*, 88 F.3d at 929. Courts have developed a multi-factor "economic realities" test to determine whether a worker is an employee or an independent contractor under the FLSA. *See, e.g., Tony & Susan Alamo*, 471 U.S. at 301 (noting that the test of employment under the FLSA is economic reality); *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961) (the economic realities of the worker's relationship with the employer control, rather than any technical concepts used to characterize that relationship). The factors typically include:

    a.   the degree of control exercised or retained by the employer;

    b.   the worker's opportunity for profit or loss depending on his or her managerial skill;

    c.   the extent of the relative investments of the employer and the worker;

    d.   whether the work performed requires special skills and initiative;

    e.   the permanency of the relationship,

      f.   the extent to which the work performed is an integral part of the

          employer's business;

*See* U.S. Department of Labor Wage and Hour Division Administrator's Interpretation

No. 2015-1 (July 15, 2015) (directing the use of economic realities analysis in questions

of employee or independent contractor status under the FLSA with a strong presumption

in favor of employee status).  In applying the economic realities factors, courts have

described independent contractors as those workers with economic independence who are

operating a business of their own. On the other hand, workers who are economically

dependent on the employer, regardless of skill level, are employees covered by the FLSA.

*See, e.g., Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) ("To determine

if a worker qualifies as an employee, we focus on whether, as a matter of economic

reality, the worker is economically dependent upon the alleged employer or is instead in

business for himself."); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th

Cir. 1998) (the economic realities of the relationship govern, and the focal point is

whether the individual is economically dependent on the business to which he renders

service or is, as a matter of economic fact, in business for himself); *Brock v. Superior

Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a

matter of economic reality, the workers depend on someone else's business . . . or are in

business for themselves."). "Ultimately, in considering economic dependence, the court

focuses on whether an individual is 'in business for himself' or is 'dependent upon

finding employment in the business of others.'" *Scantland v. Jeffry Knight, Inc.*, 721 F.3d

1308, 1312 (11th Cir. 2013) (*quoting Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 301-

02 (5th Cir. 1975)).

Moreover, the economic realities of the relationship, and not the label an employer gives it, are determinative. Thus, an agreement between an employer and a worker designating or labeling the worker as an independent contractor is not indicative of the economic realities of the working relationship and is not relevant to the analysis of the worker's status. *See, e.g., Quinteros v. Sparkle Cleaning, Inc.*, 532 F.Supp. 2d 762, 768 (D.Md. 2008)("[E]ven if a contract clearly defies the relationship as one of client/subcontractor, it may still constitute  an employer/employee relationship for purposes of the FLSA");  *Scantland*, 721 F.3d at 1311 ("This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'") (*quoting Rutherford Food Corp.*, 331 U.S. at 729); *Superior Care*, 840 F.2d at 1059 ("[E]mployer's self-serving label of workers as independent contractors is not controlling."); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (explaining that "[a]n employee is not permitted to waive employee status," and affirming that welders were employees despite having signed independent contractor agreements). Likewise, workers who are classified as independent contractors may receive a Form 1099-MISC from their employers. This form simply indicates that the employer engaged the worker as an independent contractor, not that the worker is actually an independent contractor under the FLSA. *See Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010) (worker's receipt of Form 1099-MISC from employer does not weigh in favor of independent contractor status). "Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." *Real v. Driscoll Strawberry Assocs., Inc*., 603 F.2d 748, 755 (9th Cir. 1979).

17

The ultimate inquiry under the FLSA is whether the worker is economically dependent on the employer or truly in business for him or herself. If the worker is economically dependent on the employer, then the worker is an employee. If the worker is in business for him or herself (i.e., economically independent from the employer), then the worker is an independent contractor. In this case, it is clear from the record and an analysis of the factors that Plaintiffs were not in business for themselves but rather were economically dependent on Defendant. As such, the record and the factors support an employee finding.

### a. Defendants had ultimate control over Plaintiffs' work.

With regard to the first factor, when determining the degree of control an employer club has over an individual dancer at the club, courts "generally look not only to the guidelines set by the club regarding the entertainers' performances and behavior, but also to the club's control over the atmosphere and clientele." *Butler v. PP&G, Inc.*, 2014 U.S. Dist. LEXIS 5804, *4 (D. Md. Jan. 16, 2014) (finding economic dependence where, even though club did not control the "day-to-day decisions" of its dancers, it still exercised significant control by regulating "the advertising, location, business hours, maintenance of facility, [and] aesthetics"). Courts also have found significant control where clubs establish conduct policies and control performance pricing. *See McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 269 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (finding significant control where club "imposed written guidelines" pertaining to dancer conduct that included requiring dancers to sign-in; pay "tip-in" fee; comply with set prices for private dances; and comply with behavioral guidelines).

18

The undisputed facts demonstrate that this elements weighs heavily in favor of Plaintiffs.  Defendants set the club hours.  Jackson 129.  Defendants required dancers to sign in.  Jackson 82. Defendants required dancers to tip in, and set drink prices.  Jackson 90, 100, 110.  Defendants controlled the day-to-day decisions of the clubs including setting the location, business hours, making maintenance decisions, and established the aesthetics of the club.  Jackson 38.  Defendants also put in place set rules, the violations of which resulted in fines.  Exhibits 2, 5.  *See McFeeley*, 47 F. Supp. 3d at 269; *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 918 (S.D.N.Y. 2013) (reasoning that a club's "power to impose fines, and its imposition of them even on a temporary basis, are strong indicators of its control over the dancers"). For example, Defendants required dancers to be on the floor at all times while on a shift, to perform their dances on a set schedule, and were prohibited from leaving the building, talking on their phones, or leaving early.  Exhibits 2, 5. Defendants also imposed guidelines pertaining to dancer conduct, including requiring signed documentation to acknowledging receipt of those guidelines.  *See* Independent Contractor Agreement attached hereto as Exhibit 5. Defendants could send dancers home or suspend them for engaging in activities in violation of these rules.  Jackson 122.  Therefore, it is clear that Defendant exercised significant control over Plaintiff, favoring an employee relationship.  *See Butler*, 2013 WL 5964476, at *4; *see also McFeeley*, 47 F. F.Supp. 3d at 269; Hart, 967 F. Supp. 2d at 918.

**b.** **_The managerial skills of Defendants and not of Plaintiffs controlled Plaintiffs' opportunity for profit or loss._**

The Courts have indicated that this factor typically weighs in favor of the dancer in these matters.  In _McFeeley_, the Court held that "hustling" is not the type of initiative contemplated by this element.  _McFeeley_, 47 F. Supp. 3d at 270.  The Court stated:

> While it is true that "once customers arrive at [the club], a dancer's initiative, hustle, and costume significantly contribute to the amount of her tips," the club's owner in fact significantly controls the dancers' opportunity for profit or loss, as he "has a significant role in drawing customers to [his] nightclub."  The club and its owners, through "advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory of beverages and food" controlled customer volume in the clubs. The clubs therefore significantly controlled the dancers' opportunity for profit.

_Id_ at 270 (internal citations omitted).  _McFeeley_, therefore, has rejected the premise that this factor is, in any way, influenced by a dancer's ability to use initiative to work hard and increase their profits by encouraging extra tips and sales.  _Id._  As indicated above, Defendants controlled the customer volume through engaging in advertisements, choosing the locations of the clubs, establishing business hours, conducting the maintenance of the facilities, determining the aesthetics of the clubs, and determining the inventory of beverages served at the clubs.  This factor, therefore, weighs in favor of Plaintiffs.

**c.** **_Defendants' investment was substantial while Plaintiffs' investment was nominal._**

With regard to the third factor, courts look at the "investment in equipment or material, or [their] employment of other workers."  Schultz, 466 F.3d at 305.  This factor focuses on investments made in the club by the dancers and club owners respectively. _McFeeley_, 47 F.Supp.3d at 271, _see also Morse v. Mer Corp._, No. 1:08-CV-1389, 2010

U.S. Dist. LEXIS 55636, 2010 WL 2346334, at *4-5 (S.D. Ind. June 4, 2010) (noting that "[a] dancer's investment in costumes . . . . is relatively minor to the considerable investment [the club] has in operating a nightclub. [It leases fixtures for the nightclub . . . . owns sound equipment and music, maintains and renovates the facilities, and advertises extensively"). It is important to note that the *McFeeley* Court cited *Morse* with approval. *McFeeley*, 47 F.Supp.3d at 271.  Plaintiffs made no capital investments in Defendants' operations.  Exhibits 2, 5.  Defendants owed the club, and maintained and renovated the facilities, as well as controlled the advertisements of the clubs.  Jackson 10, 11, 28-30. Therefore, this factor favors Plaintiff, as well.  See Schultz, 466 F.3d at 305.

> **d.** **There was no degree of skill required for Plaintiffs to perform their job duties.**

"Courts have held that there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer."  *McFeeley*, 47 F. Supp. 3d at 271–72 (*citing Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 149 (D.D.C. 2011)); *see also Butler*, 2013 WL 5964476, at *5.  Defendant made it very clear that there was no particular degree of skill required of dancers at the club.  Jackson 60. Therefore, this factor also weighs in favor of Plaintiff. See McFeeley, 47 F. Supp. 3d at 241, 271–72.

> **e.** **The permanence of the working relationship between Plaintiffs and Defendants is wholly consistent with "at will" employment.**

Plaintiffs worked for Defendants for a number of years.  In one of Defendant Jackson's numerous communications with the Court, Defendant Jackson stated, that Ms. Braxton worked approximately 144 weeks for Defendants, Ms. Scott worked approximately 96 weeks for Defendants, Ms. Gamble worked approximately156 weeks

for Defendants and Ms. Williams worked approximately 84 weeks for Defendants. *See*

Exhibit 10 at page 7. This is wholly consistent with an "at will" employment relationship

and so weighs strongly in favor of an employee finding.

### f.    *Plaintiffs' services were utterly integral to Defendants' business.*

Plaintiffs were undeniably an integral part of Defendants' business. This Court

has stated that "any contention that the exotic dancers were not integral to the operation

of [an exotic dance club] flies in the face of logic." *Butler*, 2013 WL 5964476, at *5.

The Court has summarily discounted claims that exotic dance clubs are, actually, other

forms of establishments such as sports bars. *See e.g.* Chaves v. King Arthur's Lounge,

Inc., 2009 Mass. Super. LEXIS 298, *9-10 (Mass. Super. Ct. July 30, 2009) stating:

> It argues that the strip dancing that takes place in the lounge is merely a
> form of entertainment it provides for its patrons, akin to the televisions
> and pool tables in a sports bar. Thus, it analogizes, just as televisions
> airing sporting events do not make sports the "usual course of business"
> for a sports bar, neither do exotic dancers make King Arthur's a strip club.
> King Arthur's argument likening its exotic dancers to televisions or Keno
> machines is not persuasive.

*See also Butler v. PP&G, Inc*., 2014 U.S. Dist. LEXIS 5804, *6-7 (D. Md. Jan. 16, 2014)

stating

> in his deposition, stated that Norma Jean's was a sports bar. Walter
> Robinson also stated in his deposition, however, that the club had
> "hundreds" of exotic dancers and that, at any given time, between thirty
> and forty girls danced at Norma Jean's. He additionally noted that exotic
> dancing was offered during all hours of operation. Moreover, most courts
> to have considered the issue have noted the importance of topless dancers
> to topless nightclubs. *See, e.g., Hart v. Rick's Cabaret Intern., Inc.,* 967 F.
> Supp. 2d 901, 921, No. 09 Civ. 3043(PAE), 2013 U.S. Dist. LEXIS
> 129130, 2013 WL 4822199, at *14 (S.D.N.Y. 2013); *Harrell v. Diamond
> A Entertainment, Inc.*, 992 F. Supp. 1343, 1352 (M.D. Fla. 1997). Even if
> the Court's characterization of Norma Jean's as a "topless nightclub" is
> extrapolating from the record (although all logic suggests otherwise), this
> factor at best weighs neutrally in the analysis and does not affect the
> Court's ultimate determination.

As in *Butler*, Defendant Jackson testified that Defendants had exotic dancers working every night during all hours of operation.  Jackson 26 – 27.  Moreover, Defendants rules required the dancers to perform their sets unless they were engaged in private dances. Exhibits 2, 5.  The undisputed facts indicate that exotic dancers were absolutely integral to Defendants' business.   Therefore, this factor weighs in favor of Plaintiffs as well.

  **g.  Plaintiffs were employees of Defendants rather than independent contractors.**

   As a matter of law that Plaintiffs were employees of Defendants. Defendants exercised the requisite degree of control of Plaintiffs work and the club.  Plaintiffs opportunity for profit or loss was controlled by Defendants as Defendants controlled the customer volume through engaging in advertisements, choosing the locations of the clubs, establishing business hours, conducting the maintenance of the facilities, determining the aesthetics of the clubs, and determining the inventory of beverages served at the clubs.  Plaintiffs had no capital investments in the Defendants' operations and Defendants had significant capital investments.  There was no particular skill required for the position of exotic dancer. Finally, the services provided by Plaintiffs were integral to Defendants' operations.  Based on the totality of the circumstances, Plaintiffs were employees of Defendants rather than independent contractors.  *See McFeeley*, 825 F.3d at 241; *Schultz*, 466 F.3d at 304–05; *see also McFeeley*, 47 F. Supp. 3d at 269; *Butler*, 2013 WL 5964476, at *4; *Hart*, 967 F. Supp. 2d at 918.

23

**6.      Defendants are liable to Plaintiffs jointly and severally for wages.**

>    *a.      Defendants are liable under the FLSA and the MWHL.*

The FLSA requires employers to pay their employees at a wage not less than the minimum wage.  See 29 U.S.C. § 206.  The purpose of the federal statute "is to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'"  *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (*quoting Tenn. Coal, Iron & R.R. v. Muscoda Local No*. 123, 321 U.S. 590, 597 (1944)).  Similarly, the MWHL "allows employees to recover wages withheld unlawfully from them by their employers."  *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015).  The MWHL also mandates a minimum wage standard for employers.  See Lab. & Empl. § 3-413.

Defendants did not pay Plaintiffs an hourly wage.  Defendants' discovery responses indicate that Plaintiffs were not paid any hourly wages.   *See* Answers to Interrogatories attached hereto as Exhibit 3 at Answer to Interrogatory No. 7, pgs. 8-9. Defendants did not pay Plaintiffs a salary.  Rather, Defendants paid Plaintiffs on a commission basis.  Jackson 56.  However, the "Commission Payments" records provided by Defendants are incomplete at best demonstrate that those commission payments often did not amount to even minimum wage.  Exhibit 8.  Those records are, in large part, incomplete as they do not fully account for all hours worked.  For example, document bates' stamped EL00002 shows a time of 7:50-left for January 22 without indicating what time "left" is meant to represent.  Exhibit 8.

Even a cursory view of Defendants' document production indicates that Defendants did not pay Plaintiffs the minimum wage required.[3]  The below chart is a representative sample:[4]

| Bates' Number | Week | Wage Paid | Hours Worked | Wages Owed at $7.25 |
|---|---|---|---|---|
| EL000001 | Jan. 1 | $80 | 22.6 | $163.85 |
| EL000006 | April 29 | $15 | 4.5 | $32.63 |
| EL000009 | June 1 | $0 | At least 3-4 | <$21.75 |
| EL000017 | Nov. 1 | $20 | 11.68 | $84.68 |
| EL000021 | Feb. 1 | $20 | 31.78 | $230.40 |

Moreover, the incomplete records provided by Defendants do not include the amount Plaintiffs had to "tip-in" or "tip-out," the amounts received, if any, for services such as private dances, or the fees assessed against Plaintiffs by Defendants.  It is, therefore, undisputed that the alleged "commissions" Defendants paid to Plaintiffs often did not equal or exceed the required minimum wage.  As the FLSA and MWHL required a payment of at least the minimum wage, Defendants are jointly and severally liable to Plaintiffs for Defendants willful failure to pay that wage to Plaintiffs.

---

[3] No records indicating the amount paid to Plaintiff Gamble was provided by Defendants.

[4] The chart included is just a representative sample demonstrating that Plaintiffs did not receive at least the minimum wage from Defendants.  As this Motion for Summary Judgment does not include a request for actual damages at this stage, the full damages may be calculated in further proceedings.

###### b.    *Defendants are liable under the MWPCL.*

Furthermore, Defendants also are liable under the MWPCL.  The MWPCL requires an employer to pay an "employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Lab. & Empl. § 3-505.  At the end of Plaintiffs' employment with Defendants, Plaintiffs still had not been paid any wages.  As such, Defendants are liable to Plaintiffs as a matter of law.

### 7.    **Defendants' affirmative defenses are inapplicable.**

###### a.    *It is Defendants' burden to prove their affirmative defenses.*

It is a fundamental legal principal that the burden of proving affirmative defenses lies with the defendant. *See e.g. Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, Case No. 09-cv-0100, 2011 U.S. Dist. LEXIS 23627, *40, (D.Md. Mar. 9 2011) *citing McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir. 2007); *Belay v. Getachew*, 272 F.Supp. 2d 553, 559 (D.Md. 2003); *Bryant v. Better Business Bureau*, 923 F. Supp. 720, 738 (D.Md. 1996) ("The ultimate burden, as with all affirmative defenses, of proving an 'undue hardship' remains at all times with the Defendants.").

###### b.    *Defendants' affirmative defense of setoff cannot be established as a matter of law.*

The Court has been explicit in what must be proven in order to claim a defense that the wages paid plaintiff dancers are setoff by service charges.  The FLSA provides;

> service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act.  Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

26

29 C.F.R. 531.55(b).  The federal courts have stated that the critical issue if the employer

wants to use such fees as an offset is that it must have been included in the

establishment's gross receipts. *See e.g., Hart v. Rick's Cabaret Int'l, Inc*., 967 F. Supp. 2d

901, 929 (S.D.N.Y. 2013) *citing Reich v. Priba Corp*., 890 F. Supp. 586, 595 (N.D. Tex.

1995) ("The fact that all of the table dance fees are not reported as gross receipts is fatal

to Cabaret Royale's claim that the tips are more properly classified as wages."); *Reich v.*

*ABC/York-Estes Corp*., No. 91 C 6265, 1997 U.S. Dist. LEXIS 6874, 1997 WL 264379,

at *5 (N.D. Ill. 1997) ("This court agrees . . . that an employer must include payments in

its records as gross receipts as a prerequisite to 'service charge' classification under the

FLSA."); *Chan v. Sung Yue Tung Corp*., No. 03 Civ. 6048 (GEL), 2007 U.S. Dist. LEXIS

7770, 2007 WL 313483, at *15 (S.D.N.Y. 2007) ("If the [fee] paid by customers was a

service charge, the full amount should have been included in the defendants' gross

receipts, and any portion paid to plaintiffs should have been paid as wages and reported

as such on plaintiffs' W-2 forms.").  In *McFeeley*, the Court stated that with regards to

premium services such as lap dances, "[s]ince none of those payments ever went to the

clubs' proprietors, defendants also could not have distributed any part of those service

charges to the dancers." *McFeeley*, 825 F.3d at 246.  As a result, the Court held that

those fees for premium services could not be used to offset the wage requirements of the

FLSA.

Defendants testified that they did not receive any service charges for premium

services such as lap dances.  Mr. Jackson testified, "[w]e get none of the lap dance

money.  That's their money."  Jackson 62.  Mr. Jackson also testified, "[y]ou know, so I

mean we've got some areas that if a person is pouring a $50 drink he could say it and

27

then they do their lap dances, they keep that money." Jackson 100.  According to Mr.

Jackson, Defendants "don't get a dime off them lap dances.  Not a penny." Jackson 114.

According to Mr. Jackson, therefore, as in *McFeeley*, none of the payments for premium

services such as lap dances went to the clubs' proprietors, and so Defendants could not

have distributed any part of those service charges to the dancers.  Therefore, as a matter

of law, the offset contained in 29 C.F.R. 531.55(b) is unavailable to Defendants.

However, even if Defendants received those "service charges," Defendants have

provided no evidence that any fees were included in Defendants' gross receipts.  In

Plaintiffs' discovery requests, Plaintiffs requested, "[a]ll *documents* that contain, reflect,

describe and/or otherwise set forth and/or support any defense any Defendant asserts or

will assert in this action."  Exhibit 7 at pg. 10, Request No. 5.  Defendants responded with

29 objections and did not provide any documents in response.  *Id.*  In Plaintiffs' Request

No. 6, Plaintiffs requested "[a]ll documents that contain, reflect, describe and/or

otherwise describe any mitigation, set-off, offset, or counter-claim calculation or

damages that any Defendant has or may assert in this case."  *Id*. at Request No. 6 at pg.

10.  Defendants responded with 29 objections and provided only incomplete documents

purporting to show that Plaintiffs were paid commissions.  *Id.* No documentation

regarding any mitigation, set-off, or offset was provided. Therefore, Defendants have

provided no evidence of any offset, or set-off, or any other defense in this matter.

Lacking any such evidence, Defendants cannot assert that any service charges may be

used to satisfy the monetary requirements of the FLSA.  As Defendants cannot claim any

offsets, Plaintiffs are entitled to the full amount of wages earned.

     **c.**     *Defendants cannot utilize the tipped employee exemption to the minimum wage as a defense to the wages owed Plaintiffs.*

The FLSA provides that an employee who regularly receives tips may be paid less than the minimum wage in certain circumstances. Section 29 U.S.C. 203(m) permits an employer to credit a portion of the actual amount of tips received by the employee against the required minimum wage. *Chung v. New Silver Place Rest., Inc.*, 246 F.Supp. 2d 220, 228 (S.D.N.Y. 2002). The "tip credit" provision, however, is strictly construed, and an employer may not take a tip credit unless it complies strictly with both statutory requirements. *Id.   McFeeley*, the Court held that to be eligible for the "tip credit" under the FLSA and corresponding Maryland law, defendants were required to pay dancers the minimum wage set for those receiving tip income. *McFeeley*, 825 F.3d 245-246.  As indicated above, Defendants did not pay hourly wages, and Plaintiffs received far less in "commissions" than the minimum wage.  As such, the tip credit provision of the FLSA and corresponding Maryland law is unavailable to Defendants.  Therefore, Defendants' affirmative defense of setoff is not proper.

     **d.**     *Each of Defendants' remaining affirmative defenses are inapplicable. .*

The undisputed facts indicate, even agree to those facts presented by Defendants for purposes of this motion, the Plaintiffs were not paid the minimum wage for all hours worked, and were paid less than the wage required to use commissions to offset wages owed.  As such, Defendants' first affirmative defense of failure to state a claim upon which relief can be granted is inapplicable.  The second affirmative defense invoking the statute of limitations only pertains to any wages sought that were earned three years before Plaintiffs joined this litigation.  As Plaintiffs are only seeking damages for the three years prior to joining this litigation, Defendants' second affirmative defenses is

inapplicable.    As indicated above, Defendants did not pay Plaintiffs at least the minimum wage for all hours worked.  Therefore, Defendants affirmative defense of having paid Plaintiffs for all monies due is also inapplicable.  Finally, as indicated above, Defendants cannot claim a set off to the wages owed because they did not provided any evidence to substantiate that alleged setoff.  Therefore, each of Defendants' affirmative defenses are inapplicable in this matter.

### D.    CONCLUSION

Wherefore, Plaintiffs respectfully request the Court enter Judgment in favor of Plaintiffs and against Defendants jointly and severally.  The undisputed facts demonstrate that the FLSA applies in this matter with regards to both corporate defendants as well as Mr. Jackson. The corporate defendants operate as a single business entity.  Mr. Jackson is subject to personal liability pursuant to the FLSA and Maryland law.  The undisputed facts further demonstrate that Plaintiffs were employees of the Defendants pursuant to the *Silk* factors.  It is also undisputed that Defendants did not pay Plaintiffs an hourly wage or wages sufficient to amount to minimum wage for all hours worked.  As such, Defendants are also liable under Maryland's Wage Payment and Collection Law.  Finally, it is undisputed that Defendants' affirmative defenses are inapplicable.  The burden is on Defendants to prove those defenses, yet Defendants provided no evidence of gross receipts, tax records, and only provided extremely limited records of the hours worked by Plaintiffs and the money Plaintiffs received from Defendants.  For all these reasons, summary judgment is proper as to all issues other than the number of hours worked by each Plaintiff for Defendants and the ultimate total damages owed.

Respectfully submitted,


/s/
Ken C. Gauvey (28464)
Law Practice of Ken C. Gauvey
6700 Alexander Bell Drive
Suite 200
Columbia, MD 21046
(P) 410-346-2377
(F) 866-487-1154
kgauvey@gauveylaw.com
*Counsel for Plaintiffs*